George M. Lee (SBN 172982)
gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, California 94111
Phone: (415) 979-0500
Fax: (415) 979-0511

John W. Dillon (SBN 296788)
jdillon@gdandb.com
2762 Gateway Road
Carlsbad, California 92009
Phone: (760) 431-9501
Fax: (760) 431-9512

Raymond M. DiGuiseppe (SBN 228457)
law.rmd@gmail.com
**THE DIGUISEPPE LAW FIRM, P.C.**
4320 Southport-Supply Road, Suite 300
Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM BRANDY, an individual, et al.,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>ALEX VILLANUEVA, in his official capacity as Sheriff of Los Angeles County, California, and in his capacity as | Case No. 2:20-cv-02874<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER, AND ISSUANCE OF PRELIMINARY INJUNCTION**<br><br>**[FRCP 65; C.D. L.R. 65-1]** |

| | | |
|---|---|---|
| the Director of Emergency Operations, et al.,<br><br>　　　　　　　　Defendants. | Date:<br>Time:<br>Courtroom 7B<br>Judge: | TBD<br>TBD<br><br>Hon. André Birotte Jr. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................iv

I.     INTRODUCTION ..............................................................................1

II.    STATEMENT OF FACTS ...................................................................3

III.   ARGUMENT ....................................................................................7

       A. STANDARD ..............................................................................7

       B. PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIMS. .................8

          1.  The Orders Unilaterally Suspend Second Amendment Rights by Fiat. 8

             (a) A Policy Amounting to a *De Facto* Prohibition on Second
                 Amendment Rights is Categorically Unconstitutional. ................10

             (b) The Orders Cannot Survive Any Level of Scrutiny. .....................14

          2.  THE ORDERS ARE  UNCONSTITUTIONALLY VAGUE, ARBITRARY, AND
              VIOLATE DUE PROCESS........................................................18

       C. THE DESTRUCTION OF CONSTITUTIONAL RIGHTS CONSTITUTES
          IRREPARABLE INJURY.............................................................23

IV.    CONCLUSION ................................................................................25

1

## TABLE OF AUTHORITIES

2

**CASES**

3

4
*Andrews v. State*, 50 Tenn. 165 (1871)....................................................................9

5
*Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ...............25

6
*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017)...............................................15, 16

7

8
*Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469 (1989) ...........16

9
*Carey v. Population Servs., Int'l*, 431 U.S. 678 (1977) ...........................................10

10
*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 130 S.Ct. 876 (2010) .....16

11

12
*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................................*passim*

13
*Duncan v. Becerra*, 265 F.Supp.3d 1106 (S.D. Cal. 2017),

14
   aff'd, 742 F.App'x 218 (9th Cir. 2018)............................................................15, 24

15
*Edenfield v. Fane*, 507 U.S. 761 (1993) ..................................................................17

16

17
*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................24

18
*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...........................9, 11, 17, 24

19
*Gonzales v. Carhart*, 550 U.S. 124 (2007)..............................................................19

20

21
*Grace v. District of Columbia*, 187 F.Supp.3d 124 (D.D.C. 2016)........................24

22
*Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999) ....17

23
*Illinois Ass'n of Firearms Retailers v. City of Chicago*,

24
   961 F.Supp.2d 928 (N.D. Ill. 2014) .......................................................................9

25
*Italian Colors Rest. v. Becerra*, 878 F.3d 1165 (9th Cir. 2018) .............................17

26

27
*Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014)..................9

28

– iv –

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TRO/PRELIM. INJUNCTION
CASE NO. 2:20-cv-02874

*Kolender v. Lawson*, 461 U.S. 352 (1983) ................................................................ 19

*Luis v. United States*, 136 S.Ct. 1083, 194 L.Ed.2d 256 (2016) ............................ 10

*Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018) .................................................... 10

*McCulloch v. State*, 17 U.S. 316, 415 (1819) ............................................................ 1

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .................................................. 9

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ................................................ 24

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) ................................ 24

*Ms. L. v. U.S. Immigration and Customs Enforcement*,
   310 F.Supp.3d 1133 (S.D. Cal. 2018) .................................................................. 25

*Norsworthy v. Beard*, 87 F.Supp.3d 1164 (N.D.Cal. 2015) ..................................... 24

*Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980) .......................................... 9

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ............................................. 25

*Summer Joy Lake v. Wells Fargo Bank, N.A.*, No. CV 19-9334 FMO (JCX),
   2020 WL 1164067 (C.D. Cal. Feb. 11, 2020) ........................................................ 8

*Tattered Cover v. City of Thornton*, 44 P.3d 1044 (Colo. 2002) .............................. 9

*Turner Broad. Sys., Inc.*, 520 U.S. 180 (1997) ....................................................... 17

*United States v. Alvarez*, 617 F.3d 1198 (9th Cir. 2010) ......................................... 16

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) .................................... 14, 16

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) .............................................................................................. 20

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ............................................... 8

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............................... 1

**STATUTES**

Cal. Pen. Code § 27540 .........................................................12

Cal. Pen. Code § 27545 .........................................................11

Cal. Pen. Code § 28175 .........................................................12

Cal. Pen. Code § 28200 .........................................................12

Cal. Pen. Code § 30312 .........................................................11

**OTHER AUTHORITIES**

Charles Alan Wright et al.,
    *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) ....................................24

# I.   INTRODUCTION

The "constitution [was] intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs." *McCulloch v. State*, 17 U.S. 316, 415 (1819). Indeed, "the forefathers … knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring). And, "they made no express provision for exercise of extraordinary authority because of a crisis." *Id.* (Jackson, J., concurring). Put differently, the Constitution's protections remain robust through peace and turmoil. An emergency declaration does not justify the complete destruction of a constitutional right.

Defendants, however, have used the COVID-19 pandemic to completely deprive millions of law-abiding Californians of their Second Amendment rights— according to the challenged laws, policies, and practices of Defendants, Plaintiffs may not lawfully possess, acquire, or transfer firearms and ammunition essentially until Defendants say so. But times of uncertainty and disturbance are precisely when the right to self-defense is most important. When the Second Amendment was ratified, "Americans understood the 'right of self-preservation' as permitting a citizen to 'repel force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *District of Columbia v. Heller*, 554 U.S. 570, 595

(2008) (quoting 1 Blackstone's Commentaries 145–46, n.42 (1803)) (brackets omitted). A global pandemic epitomizes a situation in which waiting for "the intervention of society" on one's behalf may be too late.

Defendants have implemented a number of restrictions on various aspects of life, including the operation of businesses, in an attempt to quell the number of individuals who become infected by COVID-19. Regardless of their intentions, the various orders issued by Defendants contradict one another, are vague and confusing, have led to differing interpretations by government officials, and ultimately, result in the closure of firearm and ammunition retailers and prevent individuals from being able to acquire firearms and ammunition for defense of their hearth, home, and self. While Defendants have a legitimate interest in reducing the populations exposure to COVID-19, the manner in which Defendants are doing so is overbroad, irrationally tailored to meet that goal, and categorically unconstitutional. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Id.* at 636. These include policy choices effecting an absolute prohibition of Second Amendment rights. *Id.* Gun stores and ranges are essential businesses, provide law-abiding individuals with critical access to constitutionally protected rights, and must remain open like other essential public accommodations.

## II.   STATEMENT OF FACTS

In response to the COVID-19 coronavirus pandemic, California Governor Gavin Newsom signed Executive Order N-33-20 on March 19, 2020. ("Executive Order"). See Decl. of George M. Lee ("Lee Decl.") **Exhibit 1**.  Governor Newsom's Executive Order included an order from Dr. Sonia Y. Angell, the State Public Health Officer. On March 22, 2020, State Defendant Angell issued a list of "Essential Critical Infrastructure Workers." Taken together (collectively the "State Orders"), the State Orders direct "all individuals living in the State of California to stay home or at their place of residence." The only exceptions are for whatever is "needed to maintain continuity of operations of the federal critical infrastructure sectors." The State Orders grant Dr. Angell the authority to "designate additional sectors as critical in order to protect the health and well-being of all Californians," but do not identify any additional sectors nor indicate which sectors may qualify as critical. These Orders took effect "immediately" and remain in effect indefinitely.

Also on March 19, 2020, the County of Los Angeles Department of Public Health issued an Order titled, "Safer at Home Order for Control of COVID-19" ("County Order"). See Lee Decl., **Exhibit 2**. The County Order applies to all of Los Angeles County, except Pasadena and Long Beach. It "requires all indoor malls, shopping centers, playgrounds and non-essential businesses to close." "Essential Businesses" may remain open. "Essential Businesses" is specifically

defined to include certain retailers and business; firearms retailers are neither expressly included nor excluded from this definition. A superseding and Revised Order was issued on March 21, 2020.  (Lee Decl., **Exhibit 3**.)

On March 24, 2020, Los Angeles County Sheriff Alex Villanueva announced through his Twitter account that, "By order of the Sheriff of Los Angeles County, gun and ammunition stores are not considered essential businesses and must close to the general public, in Compliance with Executive Order-N-33-20 and County of Los Angeles Safer at Home Order for Control of COVID-19." (Lee Decl., **Exhibit 4**.)

On March 25, 2020, Sheriff Villanueva announced on Twitter that the "LA County Sheriff's Dept. Enforcement efforts to close non-essential businesses have been suspended." (Lee Decl.,**Exhibit 5**.)

On March 26, 2020, Governor Newsom stated at a news conference that he would grant County Sheriffs the discretion to determine the essential nature of firearms retailers.  And thus, that same day, Sheriff Villanueva reversed course again. He issued a statement that "gun and ammunition stores are not considered essential businesses and must close to the general public." Sheriff Villanueva provided exceptions, however, adding that gun stores "shall be permitted to sell ammunition to security guard companies," and "making an exception for those who have already lawfully purchased a firearm, possess a valid California Firearms

Safety certificate (CFS), and simply need to take possession of their firearm." He further declared that his order applied to "the 42 contract cities and unincorporated Los Angeles County areas under [his] jurisdiction" but not the other 46 "non-contract" cites within the county, whose individual chiefs of police would be permitted to make the call as to what is and is not an "essential" business ("Sheriff Villanueva's Order").[1]

In contrast to Sheriff Villanueva, San Diego Sheriff William D. Gore issued a statement "recogniz[ing] the importance of licensed firearm retailers given the heightened concern for public security," adding that gun stores "provide a valuable public service" to the community. (Lee Decl., **Exhibit 6**.) Thus, gun stores may remain open in San Diego County. But Sheriff Gore noted the need for "further guidance from the Governor on how his order affects retail firearm establishments." Ironically, an express purpose of the State Orders was to "establish consistency across the state." But the current application of the State Orders, and the purported grant of county-by-county (and city-by-city in most of Los Angeles County) discretion to determine what is "essential" has resulted in inconsistency and uncertainty for every gun store in the state.

---

[1] Collectively, the Executive Order, the State Orders, the County Order, the City of Los Angeles's Order of March 19th (discussed in the First Amended Complaint), Sheriff Villanueva's Order, and all related policies, practices, and customs of Defendants, are collectively referred to as the "Orders."

Notably, the Department of Homeland Security, Cyber-Infrastructure Division ("CISA"), issued updated (Version 2.0) "Guidance on the Essential Critical Infrastructure Workforce" during the COVID-19 pandemic.[2] While the CISA's guidance is advisory in nature, its findings and conclusions were "developed, in collaboration with other federal agencies, State and local governments, and the private sector" for the specific purpose of "help[ing] State, local, tribal and territorial officials as they work to protect their communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security." To that end, CISA determined that "[w]orkers supporting the operation of firearm or ammunition product manufacturers, retailers, importers, distributors, and shooting ranges" fall squarely within the "critical infrastructure workforce."

Plaintiff Jonah Martinez is concerned about his safety and the safety of his family, wants to exercise his right to acquire, keep, bear and practice with arms – including firearms, ammunition, magazines, and appurtenances – and would do so, but for the reasonable and imminent fear of arrest and criminal prosecution under Defendants' policies and orders.

Plaintiffs Daemion Garro, Jason Montes, Alan Kushner, Tom Watt, DG2A

---

[2] Guidance on the Essential Critical Infrastructure Workforce, https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce

Enterprises, d.b.a. Gun World ("Gun World"), Weyland-Yutani LLC, d.b.a. Match Grade Gunsmiths ("Match Grade"), The Target Range ("Target Range"), and A Place To Shoot, Inc. ("A Place To Shoot") are concerned about their safety and the safety of their customers and the public. On behalf of themselves and their customers, Plaintiffs Garro, Montes, Kushner, Watt, Gun World, Match Grade, Target Range, and A Place To Shoot would conduct training and education, perform California Firearm Safety Certificate ("FSC") testing for and issue FSC certificates to eligible persons, and sell and transfer arms – including firearms, ammunition, magazines, and appurtenances – but for the reasonable and imminent fear of criminal prosecution and loss of their licenses under Defendants' policies and orders.

Lastly, Plaintiffs Second Amendment Foundation, Inc. ("SAF"), California Gun Rights Foundation ("CGF"), National Rifle Association of America ("NRA"), and Firearms Policy Coalition, Inc. ("FPC") collectively have hundreds of thousands of California members and supporters who are affected by the Orders, and seek relief accordingly.

## III.   ARGUMENT

### A.   STANDARD

The standard for issuing a temporary restraining order (TRO) is the same as the standard for issuing a preliminary injunction. *Summer Joy Lake v. Wells Fargo*

*Bank, N.A.*, No. CV 19-9334 FMO (JCX), 2020 WL 1164067, at *1 (C.D. Cal. Feb. 11, 2020). A movant seeking a preliminary injunction must typically demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent relief; (3) that the balance of equities favor an injunction; and (4) that an injunction promotes the public interest. *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017).

**B.     PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIMS.**

Plaintiffs will succeed on the merits of their claims, as the orders at issue—and the confusion they are generating—effectively prohibit millions of Californians from exercising rights guaranteed by the Second Amendment, and deprive them of the constitutional protections against vague and arbitrary laws under the Fifth and Fourteenth Amendments to the United States Constitution.

**1.  The Orders Unilaterally Suspend Second Amendment Rights by Fiat.**

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. And because "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered

liberty," it applies to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010) (plurality opinion).

The Supreme Court held that the Second Amendment guarantees the right to "possess" weapons. *Heller*, 554 U.S. at 592. And "the Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees. . . . [F]undamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579–80 (1980). Accordingly, "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (citing *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)). And "[t]he right to keep arms, necessarily involves the right to purchase them." *Andrews v. State*, 50 Tenn. 165, 178 (1871). *See Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928, 930 (N.D. Ill. 2014) ("the right to keep and bear arms for self-defense under the Second Amendment … must also include the right to *acquire* a firearm") (emphasis in original); *cf. Tattered Cover v. City of Thornton*, 44 P.3d 1044, 1052 (Colo. 2002) ("When a person buys a book at a bookstore, he engages in activity protected by the First Amendment because he is exercising his right to read and receive ideas and information."). Thus, the right to possess weapons necessarily also includes the

right to acquire and transfer them. "Without protection for these closely related rights, the Second Amendment would be toothless." *Luis v. United States*, 136 S.Ct. 1083, 1098, 194 L.Ed.2d 256 (2016) (Thomas, J., concurring).

For all these same reasons, firearm retailers are protected by the Second Amendment. If "[a] total prohibition against sale of contraceptives … would intrude upon individual decisions in matters of procreation and contraception as harshly as a direct ban on their use," *Carey v. Population Servs., Int'l*, 431 U.S. 678, 687–88 (1977), the same rationale applies to firearms. Thus, "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). "If there were somehow a categorical exception for these restrictions [on gun sales], it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*." *Id.* *See also Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018) (implicitly recognizing a right to sell firearms by analyzing a burden on that right).

    (a)    **A Policy Amounting to a *De Facto* Prohibition on Second Amendment Rights is Categorically Unconstitutional.**

The Supreme Court stated in *Heller* that lower courts should *not* conduct interest balancing or apply levels of scrutiny when the Second Amendment's core protection is implicated. *Heller*, 554 U.S. at 634-35 (noting that "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a

freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon."); *see also McDonald v. City of Chicago*, 561 U.S. 742, 790-91 (2010) (noting that the *Heller* Court "specifically rejected" "an interest-balancing test").

Indeed, *Heller* held a handgun ban categorically unconstitutional: "Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629. "Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional." *Ezell*, 651 F.3d at 703 (emphasis added).

At issue here is a complete and unilateral suspension on the right of ordinary citizens to acquire firearms and ammunition, a right protected by the Second Amendment. Due to the ever-expanding nature of the laws regulating firearm transfers, in-person visits to gun stores and retailers are the *only* legal means for ordinary, law-abiding citizens to acquire and purchase firearms—and now, ammunition—within the State of California. See, e.g., Cal. Pen. Code § 27545 (requiring all firearm transfers be processed through a licensed dealer); Pen. Code § 30312 (requiring all ammunition transactions to be made through a licensed

ammunition vendor, in a face-to-face transfer). In addition, gun stores are required to initiate background checks at the point of transfer, to fulfill the state's interest in ensuring that sales/transfers are not being made to prohibited persons, administer the vast majority of FSC tests to ensure that a recipient is aware of the firearm safety rules, and administer the safe handling demonstration. Pen. Code §§ 28175 ("The dealer or salesperson making a sale shall ensure that all required information has been obtained from the purchaser. The dealer and all salespersons shall be informed that incomplete information will delay sales."); 28200 et seq. (establishing procedure for collecting information and fees associated with required background checks). These are additional services that gun store dealers now *must* provide in furtherance of the state's emphasis on insuring proper gun transfers to non-prohibited persons, and firearm safety.

The State has mandated these burdensome in-person requirements, requiring, for example, two visits to gun stores for each transaction because of the waiting period laws. Defendants simply cannot be permitted to take actions that effectively shut down all firearm and ammunition transfers because such transactions cannot be done remotely as many other, non-firearm online retailers are able to do. See Pen. Code § 27540 (requirements for dealer delivery of firearms). The effect of the Orders is a destruction of the right, and it is well established that the deprivation of constitutional liberty, even temporarily, constitutes irreparable injury.

As the Orders are now being interpreted and enforced, millions of Californians are being barred from effectively acquiring firearms or ammunition. And anyone who does not already own a firearm in Los Angeles County is now entirely prevented from exercising their Second Amendment rights in all 42 cities of Los Angeles to which Sheriff Villanueva's Order applies, and every resident of every other city in the county is subject to the same constitutional deprivation upon the whimsical and unfettered declaration of the city's head of law enforcement. As such, the actions of the Defendants amount to a categorical ban not entitled to any deference or testing under tiers of scrutiny. They are flatly unconstitutional and should be declared as such right now.

This intolerable effect of a categorical ban is particularly acute within the Orders of the local Defendants (i.e., those charged with the control, management, implementation, or enforcement of the County Order, the City of Los Angeles Order, Sheriff Villanueva's Order, and the orders of the other law enforcement heads in the numerous cities within Los Angeles County). By and through the virtue of the Governor's Executive Order and later press conference statement announcing county-by-county discretionary power for sheriffs, Sheriff Villanueva's Order has already effected a shutdown of all firearms retailers within the 42 cities to which his Order applies, leaving all residents in those cities with no ability to acquire a new firearm (or any additional firearms they may reasonably

require) or any ammunition they need to defend themselves with their arms. Further, the residents of all 46 other cities within the County remain subject to the same arbitrary law enforcement power to destroy these rights. And, if Sheriff's Villanueva's public flip-flopping on social media and the news is any preview, this can be done with no more than a press release – or even a "Twitter" post – by the chief of police declaring firearms retailers "non-essential" in their respective city.

No constitutional right can be trampled on, or tossed out the window in this way – certainly not the Second Amendment right and certainly not in a time of crisis when it so vital to preserve and enable exercise of the right.

### (b)    The Orders Cannot Survive Any Level of Scrutiny.

Should this Court believe that an analysis under heightened scrutiny is appropriate, such a destruction of the Second Amendment right is unconstitutional under any level of scrutiny. Generally, the Ninth Circuit applies a two-part test for Second Amendment challenges. *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). "The two-step Second Amendment inquiry we adopt (1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *Id.* at 1136–37. However, consistent with the Supreme Court precedent, "[a] law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of

scrutiny." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). *Accord Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) ("A law that . . . amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny"). "That is what was involved in *Heller*." *Silvester*, 843 F.3d at 821 (citing *Heller*, 554 U.S. at 628–29).

As discussed *supra,* Defendants' acts strike at the very core of the Second Amendment, burdening conduct protected by the Second Amendment, satisfying the first step. At the second step of the inquiry, a court is to measure "how severe the statute burdens the Second Amendment right. 'Because *Heller* did not specify a particular level of scrutiny for all Second Amendment challenges, courts determine the appropriate level by considering '(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right.'" *Duncan v. Becerra*, 265 F.Supp.3d 1106, 1119 (S.D. Cal. 2017) (granting preliminary injunction), aff'd, 742 F.App'x 218 (9th Cir. 2018) (quoting *Bauer*, 858 at 1222). "Guided by this understanding, [the] test for the appropriate level of scrutiny amounts to 'a sliding scale.' […] 'A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny.' […] Further down the scale, a 'law that implicates the core of the Second Amendment right and severely burdens that right warrants strict

scrutiny. Otherwise, intermediate scrutiny is appropriate.'" *Bauer*, 858 F.3d at 1222 (citing *Silvester*, 843 F.3d at 821, and *Chovan*, 735 F.3d at 1138).

If heightened scrutiny applies, Defendants' policies should be evaluated under strict scrutiny, meaning Defendants must show that their policies are narrowly tailored to achieve a compelling state interest, and that no less restrictive alternative exists to achieve the same ends. *United States v. Alvarez*, 617 F.3d 1198, 1216 (9th Cir. 2010) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340, 130 S.Ct. 876, 898 (2010)). With the wide breadth of the Order and its effect of completing destroying the right to keep and bear arms during this pandemic, by no stretch of imagination would it survive strict scrutiny – which highlights the reality that it is the very sort of categorical ban that can never be tolerated under *Heller*.

But even under intermediate scrutiny, the Order, and the Defendants' enforcement of it, are unconstitutional. Under intermediate scrutiny review, the government bears the burden of demonstrating a reasonable fit between the challenged regulation or law and a substantial governmental objective that the law ostensibly advances. *Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480–81 (1989). To carry this burden, the government must not only present evidence, but "substantial evidence" drawn from "reasonable inferences" that actually support its proffered justification. *Turner Broad. Sys., Inc.*, 520 U.S. 180,

195 (1997). And in the related First Amendment context, the government is

typically put to the evidentiary test to show that the harms it recites are not only

real, but "that [the speech] restriction will in fact alleviate them to a material

degree." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1177 (9th Cir. 2018)

(citing *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188

(1999) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993)). This same

evidentiary burden should apply with equal force to Second Amendment cases,

where equally fundamental rights are similarly at stake. See, *Ezell*, 651 F.3d at

706–07 ("Both *Heller* and *McDonald* suggest that First Amendment analogues are

more appropriate, and on the strength of that suggestion, we and other circuits have

already begun to adapt First Amendment doctrine to the Second Amendment

context") (citing *Heller*, 554 U.S. at 582, 595, 635; *McDonald*, 130 S.Ct. at 3045).

*See also Marzzarella,* 614 F.3d at 89 n.4 ("[W]e look to other constitutional areas

for guidance in evaluating Second Amendment challenges. We think the First

Amendment is the natural choice.").

     Here, there can be no "reasonable fit" between a blanket Order that

effectively shuts down all legal firearm transfers, and the State and County

officials' presumptive desire to abate the spread of a viral pandemic. Retailer

Plaintiffs are more than willing to comply with all social distancing requirements

pursuant to section 15(b) of the LA County Order. Like all other retailers who are

exempt from the Order, firearm sellers can and would abide by maximum occupancy limitations. And to the extent that certain activities (such as the pickup/transfer of firearms, ammunition, and the safe handling demonstration) are statutorily mandated to be face-to-face transactions, or in person, these activities can be safely conducted while adhering to the minimum distancing requirements. For example, in order to fulfill their statutorily-mandated activities, gun stores can take other measures to minimize crowding and to facilitate other Social Distancing Requirements set forth in the Order.

Adherence to the Order is simply a take-it-or-leave it proposition, with no room for less restrictive alternatives that would otherwise allow transactions to proceed. Defendant Villanueva has recently confirmed that he simply wants all gun transactions to shut down (exempting, of course, those for alleged law enforcement and military necessities). This is simply an unwillingness to even consider less restrictive alternatives that would allow firearm transfers to proceed while preserving the interest in public health. The Order as interpreted and enforced does not pass constitutional muster under any level of review.

## 2.    THE ORDERS ARE UNCONSTITUTIONALLY VAGUE, ARBITRARY, AND VIOLATE DUE PROCESS.

The void-for-vagueness doctrine requires that a penal statute define the criminal offense such that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory

enforcement. *Gonzales v. Carhart*, 550 U.S. 124, 148–49 (2007) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). Applied to the Orders—for which criminal penalties ensure compliance—ordinary people cannot understand what conduct is prohibited. And neither can law enforcement—as the different interpretations between the San Diego County and Los Angeles County Sheriffs demonstrate. Indeed, the Sheriffs' disagreement has *already* resulted in arbitrary enforcement— millions of Californians are prohibited from exercising their Second Amendment rights in Los Angeles County, while millions are still free to do so in San Diego County, under the same Order. The nature and scope of enforcement throughout Los Angeles County is bound to vary greatly, and dangerously, given Sheriff Villanueva's Order that only 42 of the 46 cities are governed by his determination of what is "essential," while leaving the rest free to declare apparently whatever they like on this point. The Orders challenged here are demonstrably vague.

'"Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and

juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.'" *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).

No one of reasonable intelligence with honest intentions of complying with the various conflicting directives at the state and local levels could determine with any certainty whether a firearms retailer in Los Angeles County is deemed an "essential" business. Indeed, even Sheriff Villanueva cannot figure it out, as he has reversed his original position twice, so far, and he doesn't even want to figure it out for more than half of the cities within the County.

Executive Order N-33-20 directed all residents to "immediately heed the current State public health directives from the Department of Public Health" and granted authority to the State Public Health Officer. The Executive Order granted no discretion to sheriffs, and cannot be reasonably interpreted as allowing sheriffs to determine which retailers may continue operating as "essential" businesses. The Governor's later *ad hoc* statement at a news conference intended to confer discretion to local sheriffs on this point, reaching only those who happened to be tuned into the broadcast, cannot reasonably be deemed to have superseded an official publication posted on the Governor's website and circulated statewide.

Moreover, such an *an hoc* statement could not reasonably be deemed to have superseded the County's Order. That Order specifically provides that it "does *not*

supersede any stricter limitation imposed by a local public entity within the Los Angeles County Public Health Jurisdiction." Since the County Sheriff is not part of the public health jurisdiction, any "stricter limitation" he may have declared in this respect would not supersede this Order, leaving it unaffected. Consequently, residents of Los Angeles County are effectively left with two distinctly different standards on this same subject: the State Orders and the County Order, which do not expressly deem firearm retailers as "non-essential," and Sheriff Villanueva's Order which does expressly deem them as "non-essential." And it divides even further from there, given that Sheriff Villanueva is deferring to the individual determinations of the various law enforcement heads in more than half the cities in the county. This existing conflict alone produces constitutionally intolerable vagueness as residents have no clear notice of which of these directives applies.

To whatever extent the Governor's *ad hoc* press conference declaration deferring to local sheriffs here may have the force of law, as Sheriff Villanueva is currently using it, that declaration itself violates fundamental principles of due process, because it sets the stage for the very sort of arbitrary and capricious enforcement at the heart of the void-for-vague doctrine. If allowed to stand, citizens around the state will be faced with varying declarations, edicts, and orders concerning whether and under what circumstances firearm retailers may remain in operation as "essential" service providers.

A similar breed of arbitrariness subsists within the County Order, as that order classifies as "essential" a variety of businesses that have no clear connection to essential goods and services, particularly in a time of crisis. For example, mowing, landscaping, gardening, and personal grooming services are deemed to expressly fall within this category, while firearms retailers are not, even though their connection to the essentials of life in a crisis—securing the fundamental right of defense of the self and home through all lawful means—is crystal clear, as highlighted in CISA's published guidelines.

And while the County Order does not expressly include firearms retailers as "essential" businesses, it does not expressly exclude them either, creating further confusion since, again, the Order stands independent of and unaffected by the declaration of the Sheriff.[3]

Retailer Plaintiffs fall within the "Essential Businesses" definitions because they are engaged in the retail sale of household consumer products necessary for maintaining the safety of its residents, including the sale or transfer of firearms,

_____

[3] For instance. Paragraph 13(a) of the Order defines "Essential Businesses" as including "establishments engaged in the retail sale of ... other household consumer products ... [including] stores that sell ... products necessary to maintaining the safety ... and essential operation of residences." Paragraph 13(b) includes. "Food cultivation, including farming, livestock, and fishing." Paragraph 13(h) includes. "other service providers who provide services to maintain the safety ... and essential operation of properties and other Essential Businesses." Paragraph 13(n) includes businesses that "supply other Essential Businesses with the support or supplies necessary to operate." And Paragraph 13(o) protects "businesses that ship ... goods ... to residences [or] Essential Businesses." Firearms retailers fall within several of these categories, but the Sheriff's declaration says otherwise.

ammunition, accessories, and components necessary for the defense of their home, themselves, and defense of others. They are service providers who provide products such as firearms, ammunition, and servicing of same that are needed to maintain the safety and essential operation of residences (home and personal defense) and other essential businesses. They are businesses that ship goods to residences and essential businesses. They are, in every meaningful sense, "essential," as CISA has recognized and as San Diego County has declared.

However, the Orders deprive or fail to accord these business such status; they do not define critical terms; they encompass protected and non-protected actions; they omit definitions of key terms; they operate as complete bans; they do not require specific intent to commit an unlawful act; and they permit and encourage arbitrary arrests with too much discretion committed to law enforcement.

The Orders fail to give adequate guidance to those who would be law-abiding, to advise them of the nature of the offense with which they may be charged. Plaintiffs, including retailers and consumers, cannot be required to guess at the meaning of such Orders, which should be invalidated on their face and as applied.

## C. THE DESTRUCTION OF CONSTITUTIONAL RIGHTS CONSTITUTES IRREPARABLE INJURY.

"It is well established that the deprivation of constitutional rights

'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary"); *Norsworthy v. Beard*, 87 F.Supp.3d 1164, 1193 (N.D.Cal. 2015) ("Irreparable harm is presumed if plaintiffs are likely to succeed on the merits because a deprivation of constitutional rights always constitutes irreparable harm."); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (an alleged constitutional infringement will often alone constitute irreparable harm.)

"The same is true for Second Amendment rights. Their loss constitutes irreparable injury." *Duncan*, 265 F.Supp.3d at 1135. "The right to keep and bear arms protects tangible and intangible interests which cannot be compensated by damages. […] 'The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary.'" *Id*. (citing *Grace v. District of Columbia*, 187 F.Supp.3d 124, 150 (D.D.C. 2016)).  See also, *Ezell*, 651 F.3d at 699-700 (a deprivation of the right to arms is "irreparable," with "no adequate remedy at law").

Plaintiffs have established a strong likelihood of success based on clear

violations of their right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution, and their right under the Fifth and Fourteenth Amendments to be free of vague and arbitrarily enforced laws that fail to provide them a fair and adequate opportunity to conform their conduct to the law and avoid criminal or civil sanctions. "As with irreparable injury, when a plaintiff establishes 'a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction."' *Ms. L. v. U.S. Immigration and Customs Enforcement*, 310 F.Supp.3d 1133, 1147 (S.D. Cal. 2018) (quoting *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1146 (9th Cir. 2013) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.")  Because Plaintiffs have made such a showing, both the public interest and the balance of the equities weigh in favor of and compel the relief they seek of a temporary restraining order and preliminary injunction.

## IV. CONCLUSION

Plaintiffs' Application for a Temporary Restraining Order should be granted to restore the status quo ante and protect the fundamental, individual rights of Plaintiffs, Plaintiffs members, and similarly situated members of the public.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: March 30, 2020

SEILER EPSTEIN LLP

/s/ *George M. Lee*

George M. Lee

Attorney for Plaintiffs