**MICHAEL N. FEUER,** City Attorney – SBN 111529
**JAMES P. CLARK,** Chief Deputy City Attorney – SBN 64780
**KATHLEEN A. KENEALY,** Chief Assistant City Attorney – SBN 212289
**SCOTT MARCUS,** Civil Litigation Branch Chief – SBN 184980
**BLITHE S. BOCK,** Assistant City Attorney – SBN 163567
**BENJAMIN F. CHAPMAN,** Deputy City Attorney – SBN 234436
**JONATHAN H. EISENMAN,** Deputy City Attorney – SBN 279291
200 North Main Street, 7th Floor, City Hall East
Los Angeles, CA 90012
Phone No.: (213) 978-2212  Fax No.: (213) 978-0763
Email: jonathan.eisenman@lacity.org

*Attorneys for Defendants,* **ERIC GARCETTI and the CITY OF LOS ANGELES**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM BRANDY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALEX VILLANUEVA, et al.,<br><br>Defendants. | CASE NO: CV20-02874-AB (SK)<br>Hon. André Birotte Jr., Ctrm. 7B, 7th Fl., 1st Street<br>Hon. Steve Kim, Ctrm. 540, 5th Fl., Roybal<br><br>**CITY DEFENDANTS' OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................5

RELEVANT FACTS............................................................................................6

LEGAL STANDARD ..........................................................................................7

ARGUMENT........................................................................................................8

I.  The memorandum supporting the TRO application contains no argument whatsoever why a TRO should be granted against Mayor Garcetti or the City of Los Angeles, and most Plaintiffs haven't even shown standing to sue the Mayor or City over the Order. ......................8

   A.  Plaintiffs' memorandum of points and authorities contains no argument whatsoever about the Mayor's Order. .........................8

   B.  There has been no attempt at all to demonstrate most Plaintiffs' standing to sue the City or the Mayor, though that is Plaintiffs' burden................................................................................................8

II. Even assuming the arguments made against other Defendants apply to the Mayor and City, those Plaintiffs who have adequately alleged standing haven't demonstrated that they are entitled to a TRO..............9

   A.  The law and facts do not favor the Plaintiffs' position.................9

      1.  The Constitution recognizes the extraordinary powers local governments possess in times of public health emergency, including over commerce. ......................................................9

      2.  A broad emergency restriction on commerce that incidentally affects the sale of firearms doesn't offend the Second Amendment...............................................................................11

      3.  Even if the Mayor's Order is subject to Second Amendment scrutiny, the Order passes muster. ............................................13

      4.  Plaintiffs' tacked-on void-for-vagueness challenge is likewise unavailing..................................................................................15

   B.  Assuming, for argument's sake, that the Mayor's Order "irreparably harms" a Plaintiff, the balance of equities does not tip in Plaintiffs' favor—and the public interest would not be served by granting a TRO......................................................................16

CONCLUSION...................................................................................................17

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bauer v. Becerra*,
  858 F.3d 1216 (9th Cir. 2017) .................................................................. 14

*Compagnie Francaise De Navigation A Vapeur v. La. State Bd. of Health*,
  186 U.S. 380 (1902) ................................................................................. 10

*Crowder v. Kitagawa*,
  81 F.3d 1480 (9th Cir. 1996) .................................................................... 10

*District of Columbia v. Brooke*,
  214 U.S. 138 (1909) ................................................................................. 10

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .......................................................................... 11, 12

*Duncan v. Becerra*,
  742 F. App'x 218 (9th Cir. 2018) ............................................................. 14

*Frontline Med. Assocs. v. Coventry Healthcare Workers Comp., Inc.*,
  620 F. Supp. 2d. 1109 (C.D. Cal. 2009) .................................................... 7

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) (en banc) ............................................... 7, 15

*Gibbons v. Ogden*,
  22 U.S. (9 Wheat.) 1 (1824) .................................................................... 10

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905) ............................................................................. 9, 10

*Johnson v. United States*,
  135 S. Ct. 2551 (2015) ............................................................................ 16

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .............................................................................. 8, 9

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) .................................................................................. 7

*McDougall v. Cnty. of Ventura*,
   No. 2:20-cv-02927-CBM-AS (C.D. Cal. Apr. 1, 2020) .................................. 15, 17

*Missouri v. McNeely*,
   569 U.S. 141 (2013) ................................................................................................ 10

*Morgan S.S. Co. v. La. Bd. of Health*,
   118 U.S. 455 (1886) ................................................................................................ 10

*Pena v. Lindley*,
   898 F.3d 969 (9th Cir. 2018) ..................................................................... 11, 13, 14

*Peruta v. Cnty. of San Diego*,
   824 F.3d 919 (9th Cir. 2016) (en banc) ................................................................. 12

*Silvester v. Harris*,
   843 F.3d 816 (9th Cir. 2016) ............................................................................ 11, 14

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ................................................................................ 16

*Teixeira v. Cnty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) (en banc) ..................................................... 11, 12, 13

*United States v. Chovan*,
   735 F.3d 1127 (9th Cir. 2013) ................................................................................ 14

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ................................................................................................ 16

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...................................................................................................... 7

### Other Authorities

U.S. Const. amend. II ................................................................................................ *passim*

C.D. Cal. R. 7-4 ....................................................................................................................... 8

C.D. Cal. R. 7-5 ....................................................................................................................... 8

Cal. Const. art. XI, § 7 ......................................................................................................... 10

U.S. Const. amend. X ........................................................................................................... 10

## INTRODUCTION

Plaintiffs' TRO application obscures two points that are fatal both to their application and to their entire case. First, while enumerating the Second Amendment injuries that Mayor Garcetti's Safer At Home Order supposedly inflicts on them, Plaintiffs appear to have fabricated one: Nothing in the Mayor's Order prohibits them from "lawfully possess[ing]" firearms or ammunition. The Mayor's Order instead deems commerce in innumerable kinds of goods and services, including commerce in firearms, to be a non-essential activity during the COVID-19 pandemic. The actual scope of the Mayor's Order is important because of the second thing that Plaintiffs obscure: While the litany of authorities Plaintiffs cite do protect a core (qualified) right to possess a firearm, from the Supreme Court on down, they also hold that conditions a government imposes on commerce in firearms are *presumed to be constitutional*.

This is precisely the kind of situation in which one would expect that presumption to have bite. The City is experiencing an emergency in which all kinds of businesses have been temporarily shuttered to address a dire public health need. Under those circumstances, Plaintiffs—especially the gun stores and their owners—are not asking the Court to protect a person's core constitutional right to possess a firearm for self-defense. Instead, in the face of a public health crisis, they're demanding that the Court privilege their trade in firearms against a broad rule that affects all sorts of commerce. And in demanding that the Court extend gun stores that privilege via temporary restraining order, Plaintiffs are contending that the Second Amendment likely entitles them to it. Likely? No, not even if the Court subjects the Mayor's Order to a heightened level of scrutiny. Indeed, another judge of this Court recently upheld a similar closure order in the face of a Second Amendment challenge.

At bottom, Plaintiffs are asking this Court hurriedly to second-guess the Mayor's considered effort to address a public health emergency through a temporary measure that treats all non-essential commerce equally, neither specifically targeting guns nor prohibiting gun ownership or possession. The Court should decline, and deny the TRO.

**RELEVANT FACTS**

To meet "a global emergency that is unprecedented in modern history," Mayor Garcetti sought to slow the spread of the novel coronavirus in the City of Los Angeles. (Eisenman Decl. Ex. A at 2.) He therefore ordered Angelenos "to isolate themselves in their residences." (*Id.* at 2.) The Mayor's Safer At Home Order then identifies limited exceptions to this stay-at-home rule for "certain essential activities," such as obtaining healthcare and food, and, correspondingly, for providing healthcare and selling food. (*Id.* at 3–7.) Unless extended, the Mayor's Order expires on April 19—a month after it was issued, and a scant 16 days from today. (*Id.* at 7.)

There was, and remains, good reason for the Mayor to impose emergency measures. Between March 19 (when the Mayor issued the Order) and March 30, there was a 10-fold increase in the number of known COVID-19 cases (the disease caused by the novel coronavirus) in the City—from 112 cases to 1,386 cases. (Simon Decl. ¶¶ 3–4.) That looks like this:



(Simon Decl. ¶ 4.)

That number has since increased, and at last tally, there were 2,047 *identified* cases—an underestimate of *actual* cases—in the City. (*Id.* ¶¶ 4–5.) Of the cases identified, 22 percent required hospitalization, and 16 percent of those required intensive care and ventilator support. (*Id.* ¶ 6.) As of March 29, there were a total of 2,549 hospital beds in *the entire County*, of which 294 are ICU beds. (*Id.* ¶ 7.) There are 865

ventilators. (*Id.*) Any measure that averts unnecessary person-to-person contact slows the spread of infection, and so buys the County's healthcare system time to address the COVID-19 crisis before the number of sick patients overwhelms its capacity to care for them. (*Id.* ¶¶ 2, 9.)

Accordingly, the Mayor took temporary emergency steps to keep people away from each other, shutting down vast swaths of commercial activity throughout the City. (Eisenman Decl. Ex. A at 3.) That includes the 18 stores within City limits that sell either guns or ammunition or both. (Meda Decl. ¶ 4.) The Mayor has since expanded the range of venues shuttered to address additional crowding where it has subsequently occurred—even where the crowded venues provide essentials, such as food. (Eisenman Decl. Ex. B at 3, 4 [subsequently shutting down farmers markets that lack an approved crowd-control plan, and shutting down "City beaches, park trails, trail heads, and park facilities"].)

## LEGAL STANDARD

Temporary restraining orders and preliminary injunctions are drastic remedies, and may only be granted if the party seeking them carries its burden of persuasion "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (cleaned up); *see Frontline Med. Assocs. v. Coventry Healthcare Workers Comp., Inc.*, 620 F. Supp. 2d. 1109, 1110 (C.D. Cal. 2009) (TRO and preliminary injunction standards are the same). That showing must be made as to each of four elements: (1) the moving party must be likely to succeed on the merits of its claim; (2) it must be likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities must tip in its favor; and (4) an injunction must be in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

If a movant seeking injunctive relief fails at even the first element, the analysis is over and the district court must deny the application. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

# ARGUMENT

**I. The memorandum supporting the TRO application contains no argument whatsoever why a TRO should be granted against Mayor Garcetti or the City of Los Angeles, and most Plaintiffs haven't even shown standing to sue the Mayor or City over the Order.**

### A. Plaintiffs' memorandum of points and authorities contains no argument whatsoever about the Mayor's Order.

An application for a temporary restraining order must be supported by a "*complete* memorandum in support thereof and the points and authorities upon which the moving party will rely" and "[t]he evidence upon which the moving party will rely in support of the motion." C.D. Cal. R. 7-5 (emphasis added). The application by which the Plaintiffs seek injunctive relief against the Mayor and the City is supported by a memorandum that doesn't so much as mention the Mayor or the City—never mind the Mayor's Order, which is supposedly the subject of Plaintiffs' challenge. (*See* Mem. of P. & A. in Supp. of TRO [Doc. No. 14-1].) It is reason enough to deny Plaintiffs' application that they asked for a temporary restraining order against the Mayor and City without making a single argument why a temporary restraining order should be granted against the Mayor and City. C.D. Cal. R. 7-4.

### B. There has been no attempt at all to demonstrate most Plaintiffs' standing to sue the City or the Mayor, though that is Plaintiffs' burden.

It isn't hard to see why Plaintiffs failed to say a thing about either the Mayor or the City in their memorandum: Both were added as an afterthought to litigation the Plaintiffs had already undertaken against Los Angeles County and the State of California, and various County and State officials. This also explains why Plaintiffs largely failed to demonstrate that they have standing to sue either the Mayor or the City in the first place. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (a party invoking a federal court's jurisdiction bears the burden of demonstrating standing

to sue). There are 14 Plaintiffs in this case, but between the allegations in the First Amended Complaint and the declarations accompanying their TRO application, the only ones who have *possibly* demonstrated standing are (1) Plaintiff Alan Kushner (the owner of a gun store in Van Nuys), (2) Plaintiff The Target Range (Kushner's store in Van Nuys), (3) Plaintiff California Gun Rights Foundation (which claims "members and supporters" in various places, including the City), and (4) Plaintiff Firearms Policy Coalition, Inc. ("members" in the City). (First Am. Compl. [Doc. No. 9] ¶¶ 10, 14; Hoffman Decl. [Doc. No. 14-6] ¶ 5; Combs Decl. [Doc. No. 14-7] ¶ 5.) None of the other Plaintiffs have alleged any connection with the City whatsoever, leaving one to wonder how the Mayor's Order could have injured them at all. *See Lujan*, 504 U.S. at 560 (to have standing, a plaintiff must have suffered an actual injury).

**II.   Even assuming the arguments made against other Defendants apply to the Mayor and City, those Plaintiffs who have adequately alleged standing haven't demonstrated that they are entitled to a TRO.**

But assume the Court is inclined to make Plaintiffs' arguments for them, applying to the City and Mayor the arguments that Plaintiffs made against other jurisdictions and their governing officials. (The Court should not be so inclined.) Even then, Plaintiffs—those of them who have standing—have failed to demonstrate their entitlement to an emergency order requiring the Mayor to privilege one type of business over many others.

**A.   The law and facts do not favor the Plaintiffs' position.**

**1.   The Constitution recognizes the extraordinary powers local governments possess in times of public health emergency, including over commerce.**

"Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905). That is why the power to impose quarantines and other public health measures is perhaps *the* archetypal police

9

power that state and local governments possess, as the Constitution recognizes. *Id.* at 25; *Compagnie Francaise De Navigation A Vapeur v. La. State Bd. of Health*, 186 U.S. 380, 387 (1902); *Morgan S.S. Co. v. La. Bd. of Health*, 118 U.S. 455, 460 (1886); *see Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 203 (1824) ("quarantine laws" and "health laws of every description" are within the states' power to enact); *see generally* U.S. Const. amend. X (powers not delegated to the federal government are reserved to the states); Cal. Const. art. XI, § 7 (delegation of police powers to cities and counties). Such police power is "the most essential of powers, at times the most insistent, and always one of the least limitable powers of government." *District of Columbia v. Brooke*, 214 U.S. 138, 149 (1909). It follows that when exercised for "public health and safety," it is a "general principle that courts will not second-guess" the use of "traditional police powers." *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996). In the face of "prevalent and increasing" disease, a court "would usurp the functions of another branch of government if it adjudged, as a matter of law, that the mode adopted under the sanction of the State, to protect the people at large, was arbitrary and not justified by the necessities of the case." *Jacobson*, 197 U.S. at 28.

Which is to say: Of *course* the imposition of a quarantine or similar public health measure affects the rights of the people subject to it and burdens the commercial interactions in which they're engaged. *See Morgan S.S. Co.*, 118 U.S. at 465–66 (recognizing as much); *Gibbons*, 22 U.S. (9 Wheat.) at 203 (same). But courts recognize that the nature of a public health emergency can require people to yield to measures far more intrusive than a temporary cessation of business, including measures that might otherwise be deemed an impermissible invasion of their bodily integrity. *See, e.g.*, *Jacobson*, 197 U.S. at 26, 31 (state may compel vaccination against smallpox on pain of criminal prosecution); *see generally Missouri v. McNeely*, 569 U.S. 141, 148 (2013) ("an invasion of bodily integrity implicates an individual's 'most personal and deeply-rooted expectations of privacy'").

The Mayor's Order that people stay home, and—correspondingly, that most businesses close—reaches nowhere near that far. And as far as it does reach, it is supported by evidence that SARS-CoV-2, the novel coronavirus that causes COVID-19, spreads like the common cold. (Simon Decl. ¶ 2.) Without intervention, each infected person on average infects two to three others, and the virus can be spread even by people who don't exhibit symptoms of COVID-19. (*Id.*) That means that any measure that discourages interpersonal contact helps to slow the disease's spread (*id.* ¶ 9), and so justifies the Mayor taking measures to do just that: To discourage interpersonal contact by keeping people at home and, as much as possible, restricting their interactions with others.

### 2. A broad emergency restriction on commerce that incidentally affects the sale of firearms doesn't offend the Second Amendment.

Plaintiffs would have the Court pit the Mayor's broad public-health authority, in the middle of a global pandemic, against the "core right to possess a firearm for self-defense" protected by the Second Amendment. *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc); *see District of Columbia v. Heller*, 554 U.S. 570, 630 (2008) (recognizing the Second Amendment's protection of the "core lawful purpose of self-defense"). Engaging in that exercise requires a two-step analysis: The Court must first decide whether the Mayor's Order actually burdens conduct that the Second Amendment protects. *Pena v. Lindley*, 898 F.3d 969, 975 (9th Cir. 2018). If the Order does burden protected conduct, then the Court must the apply a level of scrutiny that appropriately accounts both for "'how close the [Order] comes to the core of the Second Amendment right' and 'the severity of the [Order's] burden on the right.'" *Id.* at 975, 977 (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)).

The Mayor's Order does not come close to infringing the right of any person in the City *to possess* a gun for self-defense. The Order says nothing at all about guns, or ammunition, or who can possess either, or when or where they can be possessed. To protect public health, the Order instead closes *all* non-essential businesses in the City, a

11

sweep that includes thousands more businesses than the 18 stores within City limits that sell guns or ammunition or both. It is a broad commercial regulation made for the benefit of public health; it is not a firearms regulation. At most, the Order is incidentally a "law[] imposing conditions and qualifications on the commercial sale of firearms"— that is, the type of "presumptively lawful regulatory measure[]" that falls outside the Second Amendment's reach. *Heller*, 554 U.S. at 626–27 & n.26; *cf., e.g.*, *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016) (en banc) (as a matter of its historic scope, "the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the general public to carry concealed firearms in public.")

To be sure, something like an outright and explicit ban on all firearm or ammunition sales would have spillover effects on the rights of people to possess firearms for self-defense, and so would invite a Second Amendment challenge by someone seeking to purchase a gun or ammunition. *Teixeira*, 873 F.3d at 677–78. But the City's response to a public health emergency—a response that restricts all types of businesses, and incidentally burdens a handful of stores selling guns and ammo, isn't at all like that sort of a ban. If anything, it's more like a zoning rule that prohibits a multitude of commercial uses, and which happens to include within its ambit the operation of a gun store. *See id.* at 690 (Owens, J., concurring) (claim that a zoning law happened to preclude the operation of a gun store shouldn't be viewed as a Second Amendment issue: "all 'we're dealing with here is a mundane zoning dispute dressed up as a Second Amendment challenge.'")

Moreover, any burden the Order imposes *on gun stores* isn't a Second Amendment problem, because the Second Amendment protects only the rights of would-be gun owners—it doesn't confer a right to sell guns. *Id.* at 690 (majority opn.). Of the four relevant Plaintiffs, one is a gun store and the other is that store's owner. (First Am. Compl. ¶¶ 10, 12.) As a matter of law, neither can assert a Second Amendment claim premised on their temporary inability to sell guns. *Teixeira*, 873 F.3d

12

at 690.  Either might *try* to assert a claim on their customers' behalf, *id.* at 678, but neither the store nor its owner has anything to say about customers' core right *to possess* a firearm:  Both say only that they are "concerned about [their] safety and the safety of [their] customers and the public."  (First Am. Compl. ¶¶ 10, 12.)  Particularly given the temporary and emergency nature of the Order at issue here, that is a far cry from "a plausible claim on behalf of [their] potential customers that the [Order] meaningfully inhibits residents from acquiring firearms within their jurisdiction."  *Teixeira*, 873 F.3d at 680.

And as for the other two relevant Plaintiffs, both are organizations that offer only boilerplate statements about having members in the City, and of the diversion of amorphous organizational resources because of unspecified Defendants' "laws, policies, orders, practices, customs, and enforcement actions."  (Hoffman Decl. ¶¶ 5, 7–9; Combs Decl. ¶¶ 5, 7–9.)  What is "conspicuously missing from this lawsuit is any honest-to-God resident of [the City of Los Angeles] complaining that he or she cannot lawfully buy a gun . . . ."  *Teixeira*, 873 F.3d at 680 (cleaned up).  Given that fact, the actual scope of the Mayor's Order, and the emergency context in which it was issued, there's simply no cognizable Second Amendment claim here—let alone a basis for issuing a temporary restraining order.

### 3. Even if the Mayor's Order is subject to Second Amendment scrutiny, the Order passes muster.

But even if the Court is inclined—for argument's sake—to find that the Mayor's Order reaches Second Amendment protected conduct, Plaintiffs would still need to satisfy the second prong of the Ninth Circuit's Second Amendment analysis:  They must demonstrate that the burden the Order imposes on their Second Amendment rights exceeds that allowed under the applicable level of constitutional scrutiny.  *Pena*, 898 F.3d at 975; *see id.* at 976 (in an abundance of caution, the Ninth Circuit often assumes the first prong of the analysis is satisfied and undertakes the second).

13

Unsurprisingly, Plaintiffs argue for strict scrutiny—which might be appropriate if the Mayor's Order came close to infringing the "core" right of firearm possession for self-defense, and subsequently placed a severe burden on it. *See id.* at 977 (level of scrutiny is determined by how close a regulation comes to the core rights protected by the Second Amendment, and how severely it burdens them). What Plaintiffs have not done is to identify a single case in which the Ninth Circuit applied strict scrutiny to a gun regulation. In each case they've cited, the Circuit has applied—or affirmed the district court's application of—no more than intermediate scrutiny. *See Bauer v. Becerra*, 858 F.3d 1216, 1218 (9th Cir. 2017) (upholding, under intermediate scrutiny, the allocation of a portion of firearm-transfer fee "to fund enforcement efforts against illegal firearm purchasers"); *Silvester*, 843 F.3d at 819 (upholding 10-day waiting period under intermediate scrutiny); *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013) (upholding bar on firearm possession for domestic-violence misdemeanants under intermediate scrutiny); *Duncan v. Becerra*, 742 F. App'x 218, 221 (9th Cir. 2018) (affirming the district court's decision to apply intermediate scrutiny to large-capacity magazine ban); *see also Pena*, 898 F.3d at 977 (listing cases applying intermediate scrutiny to firearms regulations). And nothing more than intermediate scrutiny *could* be appropriate here, because the challenged Order does not speak at all to the core Second Amendment right to possess a firearm for self-defense. Whatever burden it places on that right is only incidental, arising because the Order forces the 18 gun stores in the City, just like innumerable other businesses, to close on a temporary basis because of an ongoing pandemic.

Applying intermediate scrutiny, a court asks whether there is "(1) a significant, substantial, or important government objective, and (2) a 'reasonable fit' between the challenged law and the asserted objective." *Pena*, 898 F.3d at 979. That requires a showing that the Order "promotes a substantial government interest that would be achieved less effectively absent the [Order], but not necessarily that the [Order] is the least restrictive means of achieving the [City's] interest." *Id.* (cleaned up). Here, the

14

City's interest is in limiting—as much as is practically possible—close interpersonal contact between people, thereby curtailing the rate with which the novel coronavirus spreads. For every in-person transaction that risks close interpersonal contact, that interest is less effectively achieved. *Especially* given the temporary and emergency nature of the Mayor's Order limiting such contact (by limiting ordinary commerce), the City need not entertain various other schemes that might less restrictively achieve the same goal. The Order satisfies intermediate scrutiny.

Which is precisely what another judge of this Court concluded just two days ago, when a firearm buyer—someone with a protected Second Amendment interest—challenged a Ventura County order that called for the emergency closure of businesses, including gun stores. *McDougall v. Cnty. of Ventura*, No. 2:20-cv-02927-CBM-AS (C.D. Cal. Apr. 1, 2020).[1] There, as here, intermediate scrutiny applied. *Id.* at 2. There, as here, the plaintiff did not dispute the severity of the crisis the spread of SARS-CoV-2 presents: COVID-19 is a grave illness. *Id.* at 2. There, as here, there's no evidence that efforts to mitigate that spread "would be as effective without closure of non-essential businesses." *Id.*

And here, as there, the result should be that Plaintiffs have "not demonstrated [they are] likely to succeed on the merits of [their] claim." *Id.* That is reason enough to deny them a temporary restraining order. *Garcia*, 786 F.3d at 740.

### 4. Plaintiffs' tacked-on void-for-vagueness challenge is likewise unavailing.

In addition to their marquee Second Amendment challenge, Plaintiffs also contend that the State and County have subjected them to unconstitutionally vague orders. (Mem. of P. & A. in Supp. of TRO at 18–23.) It should be enough to say that, for the four Plaintiffs who are arguably subject to the Mayor's Order, the Mayor's Order isn't the State's or County's.

---

[1] A copy of Judge Marshall's order is also attached as Exhibit C to the Eisenman Declaration.

15

To prevail on a claim that a regulation is void for vagueness, a plaintiff has to show that a law is "so vague it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). The Mayor's Order prohibits the operation of non-essential businesses, and then lists—in detail—the essential businesses that are excluded from that prohibition. (*E.g.*, Eisenman Decl. Ex. A at 4–7.) There is simply nothing vague about it.

### B. Assuming, for argument's sake, that the Mayor's Order "irreparably harms" a Plaintiff, the balance of equities does not tip in Plaintiffs' favor—and the public interest would not be served by granting a TRO.

If Plaintiffs could show that they were likely to succeed on the merits of their claims—and assuming for argument's sake that they could show the Mayor's Order irreparably harmed them—they would *still* need to show that granting them a temporary restraining order would be the equitable thing to do.

Though it is their burden to make that showing, in the face of a grievous threat to public health Plaintiffs offer only a single conclusory sentence purporting to satisfy both the requirements that the balance of equities tips in their favor and that injunctive relief would be in the public interest. (*See* Mem. of P. & A. in Supp. of TRO at 25.) That is insufficient to inform the Court in its duty "to balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (cleaned up). That duty requires the Court to weigh: (1) a temporary delay in the ability of (2) a hypothetical person (3) to buy a gun or ammunition in the City of Los Angeles against (4) the public consequences of increasing the risk that our healthcare system buckles under an onslaught of COVID-19 cases, leading (5) to unnecessary suffering and death in the City. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction").

It would be a broken scale indeed that weighed those considerations in Plaintiffs' favor. *See McDougall*, slip op. at 2 (similarly finding the equities in favor of the government).

## CONCLUSION

The Court should deny Plaintiffs' application for a TRO. If, however, the Court grants the application, the City and Mayor request that the Court stay its order pending an emergency appeal to the United States Court of Appeals to the Ninth Circuit.

Respectfully submitted,

Dated: April 3, 2020

**MICHAEL N. FEUER**, City Atty.
**JAMES P. CLARK**, Chief Deputy City Atty.
**KATHLEEN A. KENEALY**, Chief Asst. City Atty.
**SCOTT MARCUS**, Civil Litigation Branch Chief
**BLITHE S. BOCK**, Asst. City Atty.
**BENJAMIN F. CHAPMAN**, Deputy City Atty.
**JONATHAN H. EISENMAN**, Deputy City Atty.

By: /s/ Jonathan H. Eisenman
**JONATHAN H. EISENMAN**, Deputy City Attorney

*Attorneys for Defendants,* **ERIC GARCETTI and the CITY OF LOS ANGELES**